Eric H. Gibbs (State Bar No. 178658)
David Stein (State Bar No. 257465)
Amy M. Zeman (State Bar No. 273100)
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, California 94104
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
Email: ehg@girardgibbs.com

*Class Counsel*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

DENO MILANO,

Plaintiff,

vs.

INTERSTATE BATTERY SYSTEM OF AMERICA, INC.; INTERSTATE BATTERY SYSTEM INTERNATIONAL, INC.,

Defendants.

Case No. 10-CV-2125-CW

**DECLARATION OF ERIC H. GIBBS IN SUPPORT OF PLAINTIFF'S SUPPLEMENTAL REPLY MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF AMENDED CLASS ACTION SETTLEMENT AGREEMENT AND PLAINTIFF'S FEE APPLICATION**

Date: June 28, 2012
Time: 2:00 p.m.
Judge: Hon. Claudia Wilken

I, Eric H. Gibbs, declare as follows:

1. I am a partner at Girard Gibbs LLP, the law firm appointed to serve as class counsel in this case. I submit this declaration in support of Plaintiff's Supplemental Reply Memorandum In Support Of Final Approval of Amended Class Action Settlement Agreement and Plaintiff's Fee Application. I have personal knowledge of the facts below and, if called upon to do so, could and would testify competently thereto.

2. Attached hereto as **Exhibit 1** is a true and correct copy of the transcript of the June 25, 2005, deposition of Wayne Barginear. Due to the short time between the deposition and this filing, class counsel has not yet received the court reporter's signed verification page.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 26th day of June 2012, at San Francisco, California.

*/s/ Eric H. Gibbs*
Eric H. Gibbs

# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA DIEGO
OAKLAND DIVISION

DENO MILANO * Case No. 10-CV-2125-CW
*
VS. *
*
INTERSTATE BATTERY SYSTEM *
OF AMERICA, INC.; *
INTERSTATE BATTERY SYSTEM *
INTERNATIONAL, INC. *

**************************************
ORAL DEPOSITION OF WAYNE BARGINEAR
JUNE 25, 2012
**************************************

ANSWERS AND DEPOSITION OF WAYNE BARGINEAR, produced as a witness at the instance of the Plaintiffs, taken in the above-styled and -numbered cause on the 25th day of June, 2012, at 9:51 a.m., before Susan M. Foreman, a Certified Shorthand Reporter in and for the State of Texas, in the offices of The Sibley firm, located at 2414 North Akard, Suite 700, in the City of Dallas, County of Dallas, and State of Texas in accordance with the agreement hereinafter set forth.

Job No. 50664

A P P E A R A N C E S

FOR THE CLASS
MR. ERIC H. GIBBS
MS. AMY M. ZEMER
GIRARD GIBBS
601 California Street
San Francisco, California 94108

FOR THE OBJECTOR WAYNE BARGINEAR
MR. THOMAS L. COX, JR.
Attorney at Law
2414 North Akard
Dallas, Texas 75201

FOR THE DEFENDANT INTERSTATE BATTERY
MS. LAURA JANE DURFEE
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201

I N D E X

PAGE
Appearances.................................. 2

WAYNE BARGINEAR

Examination by Mr. Gibbs................. 4

Witness's Signature Page/Corrections........... 32
Reporter's Certificate........................ 34

EXHIBITS

| NUMBER | DESCRIPTION | PAGE MARKED |
| --- | --- | --- |
| Exhibit 1 | 5/18/12 Letter | 6 |
| Exhibit 2 | Stipulation Re: Objector Discovery and Reply | 13 |
| Exhibit 3 | Notice of Amended Class Action Settlement | 21 |
| Exhibit 4 | Amended Class Action Settlement Agreement | 22 |
| Exhibit 5 | In re: Pre-Filled Propane Tank Marketing & Sales Practice Litigation Objection to Proposed Settlement | 23 |
| Exhibit 6 | Notice of Appeal to the US Court of Appeals for the Eighth Circuit | 23 |
| Exhibit 7 | Judgment | 24 |
| Exhibit 8 | Objection to Proposed Settlement | 25 |

P R O C E E D I N G S

WAYNE BARGINEAR,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. GIBBS:

Q. Could you state and spell your name?
A. Wayne Barginear, B-A-R-G-I-N-E-A-R.
Q. Do you understand the testimony you're providing today is being provided under oath?
A. Yes.
Q. And what does that mean to you?
A. It means I tell the truth.
Q. Okay. Is there anything -- are you under any medications or is there anything that would --
A. Blood pressure.
Q. Would that interfere with your ability to tell the truth?
A. No.
Q. Okay. Have you been deposed before?
A. Yes.
Q. How many times?
A. Four, approximately.
Q. Approximately. And connect -- can you describe the types of depositions?
A. I had a lawsuit against the DCAD on taxes.

Q. What's that, DC --
A. Dallas County Appraisal District.
Q. Okay.
A. I had a lawsuit against John Bryant, Senator John Bryant.
Q. What was that, just generally?
A. He owes -- he took money fraudent -- in fraud, I'll do it that way, and we sued him, got a judgment against him. And --
MR. COX: It's ex-Congressman John Bryant, not senator.
THE WITNESS: What did I say, senator?
A. I'd like to call him something else but we'll leave it at that.
Q. Yeah. Do that off the record.
A. That's the only ones that come to mind right now.
Q. Have you been deposed in connection with any class action cases?
A. No, I don't believe so.
Q. Have you been a plaintiff in any class action cases?
A. Yeah.
MR. COX: Are you counting an objector as a plaintiff?

MR. GIBBS: No.
MR. COX: No.
A. No.
Q. And you've objected to other class action settlements; is that correct?
THE WITNESS: Have I?
A. I have to refer to my lawyer. He handles all that.
Q. Okay. You don't know if you've objected to other class action settlements?
A. I do whatever he recommends.
(Exhibit Number 1 marked.)
Q. Okay. Let's see. I've marked as Exhibit 1 a document that your counsel filed with the Court. Take a look at that.
A. (Witness complies.) Most of this other stuff is legal jargon, other than the initial information about myself?
Q. If you don't want to look through it, just tell me and I'll ask my question. -
A. Well, what I do on anything like this, I just ask Tom. He's done all my work, company, personally, so I just defer to him on anything like this.
Q. Okay.
A. And I basically probably wouldn't understand

part of it anyway, being a dummy.
Q. Have you seen this document before?
A. I saw it, yes.
Q. When's the first time you saw it?
A. This morning.
Q. Had you seen it before then?
A. I don't think so.
Q. When did you first meet Mr. Cox?
A. Geez. 20 years ago.
Q. And in connection with what?
A. Personally.
Q. Oh, did you guys go to school together?
A. No, no, just -- we live in the same area.
Q. And has he represented you in legal matters from time to time --
A. Yes.
MR. COX: Wayne, let him finish his question before --
THE WITNESS: I'm sorry. I jump ahead. I'm sorry. I have a tendency to do that. I apologize.
Q. That's fine.
MR. COX: It's just for her. She's the one that has a tough time taking it down.
THE WITNESS: I apologize to you then.
Q. Has he represented you in legal matters from

time to time?
A. Yes.
Q. And in the context of that, has he represented you as an objector in class action cases?
A. Yes.
Q. Has he represented you in connection with any other matters other than class action cases?
A. Yes.
Q. How many times has he represented you as an objector in class action cases?
A. Once.
Q. And what case was that?
A. Propane tanks, I believe.
Q. And then is he representing you as an objector in this case?
A. Yes.
Q. Has he represented any other members of your family in connection with --
A. No.
Q. -- or as an objector in class action cases?
A. No. Well, I take that back. Cindy, my wife, may have been in one. I don't know. I can't answer that. I remember her being --
THE WITNESS: Was she deposed?
MR. COX: No.

A. Okay. She was never deposed, but for some reason I think she was involved in one.
Q. When you first met Mr. Cox, that was -- that was as a neighbor; is that right?
A. Well, neighborhood, yeah. We don't live next door or anything, but just going around the neighborhood.
THE WITNESS: And then I actually met you at the Farmers Market.
A. We had a mutual friend there that had a restaurant.
Q. Okay.
A. I met him there.
Q. Who was that?
A. A guy named Frank Zoys.
Q. Okay.
A. He had a restaurant for years down there.
Q. That's about 20 years ago?
A. Easily.
Q. All right. Can you just tell me generally what the Milano v. Interstate Battery case is about?
A. Interstate batteries --
Q. Uh-huh.
A. -- going bad and being replaced.
Q. What do you mean by that?

A. Well, the battery didn't live up to its full life. If you purchase a five-year battery and it goes bad in two years, well, it had to be replaced.
Q. And what's wrong with that?
A. What's wrong with it?
Q. Yeah.
A. Nothing other than if they -- you go in, you get a proration. As long as they prorate it appropriately, then I don't have a problem with that at all. All of them do it.
Q. And is it your contention that Interstate was not appropriately prorating the replacement batteries?
A. I would have to say based on what I've heard, yes.
Q. Based on what you've heard from who?
A. At a men's night out, a gentleman was sitting there and started talking about Interstate batteries, and I had seen the guy once or twice there before, but we were playing shuffle board. He mentioned Interstate batteries having a problem, and he said just that -- he said, Did you guys, any of you-all ever buy any. I said, Well, I do, or had. And he says, Well, you need to check because they got something wrong with them and there's a class action lawsuit.
Q. And who was that you were speaking with?

A. Just a guy in the bar.
Q. Do you remember his name?
A. No. I'd only seen him twice.
Q. And this just randomly came up?
A. Yeah. He'd challenged the table in shuffle board.
Q. And what did you do with that information?
A. Next time I was with Tom following -- I guess the following week, because I was having problems on another one of my properties with the taxing authority and I was talking to him about my position as far as suing them again.
Q. Uh-huh. And did you raise the Interstate --
A. So I asked him, I said, Have you heard anything about this class action lawsuit against Interstate batteries. And that's how it got started.
Q. When, about, was that conversation? Let me ask you a better question.
When was the conversation with the man in the bar, approximately?
A. Within the last 12 months.
Q. Was it this year?
A. I -- really I can't remember. It's just something that you hear, and I'd come in and I'd talk to him about it and it goes out of my mind. It's not

something that -- that I need to worry about. I got other things to take care of my mind.
Q. Right. When did you then hear about the Interstate class action lawsuit -- strike that.
So you raised the Interstate class action with Tom, correct?
A. Correct.
Q. When did you hear about it again?
A. I'm going to guess 30 to 60 days after that conversation I was called by Tom.
Q. And --
A. And Sibley.
Q. And who?
A. Gary Sibley, the other lawyer in the firm. His firm.
Q. And you spoke to the two of them?
A. I spoke to Tom primarily.
Q. And what was -- just generally, what was the nature of that conversation?
A. He just -- I'm sorry. He just told me that there was a class action suit and that I had been made part of it, and I told him great.
Q. And then what happened?
A. This.
Q. What is "this"?

A. Deposition.
Q. Did you look at the settlement agreement or did you familiarize yourself with the terms of the class action settlement?
A. No.
Q. And do you understand -- strike that.
Are there terms of the settlement that you're opposed to?
A. I refer to my attorney on that.
Q. Okay.
(Exhibit Number 2 marked.)
Q. I'll show you this one.
A. Okay.
Q. I've marked as Exhibit 2 a Stipulation re: Objector Discovery and Reply.
Go ahead and take a look through that, if you could, please.
A. Okay.
Q. I'm going to ask you to take a look at page -- at the top it says page 10 of 14?
A. 10 of 14?
Q. Yeah. There you go.
A. Okay.
Q. Have you seen the document that's reflected on page 10 of 14?

A. No.
Q. Flipping ahead to page 13?
A. Okay.
Q. Do you see there where it says Document Request No. 1?
A. Right.
Q. Have you seen Document Request No. 1 before?
A. Yes.
Q. When was the first time you saw that?
A. Well, I really didn't see the document. Tom told me over the phone what was needed and asked me, I'm assuming, all these questions and I answered him with each one.
Q. And did you conduct a search for the documents requested under Document Request No. 1?
A. On No. 1, after five years, I destroy all my records, so I don't have those.
Q. Okay.
A. They go out of storage and go to a shredder. You want me to go to 2?
Q. How about No. 2?
A. That went with the sale of the vehicle. I keep everything in a folder. When I sell the vehicle, I give them the folder.
Q. When did you sell the vehicle?

A. Approximately, '07.
Q. What type of vehicle was it?
A. A Ford pickup.
Q. F-150?
A. F-150, 1990.
Q. All right. And having said that, with respect to Document Requests 1 and 2, did you do anything to actually look for the documents to see if perhaps anything was left behind?
A. Well, I know in 1 there's nothing left behind because that was all shredded and disposed of.
Q. Okay.
A. 2, the gentleman I sold it to was a construction worker here on a Green Card. Where he is, I have no way of finding out. I haven't seen him since and didn't know him when he bought the truck.
Q. Did you do anything though to assess whether you had any documents left behind that may have not made it into the folder?
A. No, I mean, I looked in that year's document folder that I keep everything in, I keep it in a big -- a big box with all the files and everything, and I looked in automotive and didn't see anything, because I just automatically throw them in each folder. Each car has its own folder and everything goes in it.

Q. Do you have any other -- what other vehicles do you currently have?
A. Lexus and a Yukon.
Q. Do either of those vehicles have Interstate batteries?
A. No.
Q. Have you purchased Interstate batteries other than the one that was in the Ford F-150?
A. Before?
Q. Yes.
A. Yeah.
Q. How about since 2003 or 2004?
A. No, not since that last replacement battery.
Q. That's the one you say you purchased in 2005 or 2006?
A. No, that was -- yeah, the replacement battery. The other battery began to fail -- I'm sorry, my memory is not that good, but about two and a half to three years after I bought it, and I took it back to the store and they did their thing.
Q. You recall purchasing that initial battery in 2003 or 2004?
A. In those years. I can't tell you which one.
Q. How is it that you're able to limit it to those two years?

A. Because I remember when I replaced it, and I'm going to say it was in June of '06. That's because it was -- I know it was hot, it was in the middle of the summer, and '06 sticks in my mind, and the battery was about three years old, so '03. It may have been '04. Battery was about two and a half -- I think they told me the battery had two and a half years of its life used. Actually it was a little more. I think they said 2.8 or something like that. So eight months out of -- four months short of being three years.
Q. And you initially bought it at a Firestone store on Greenville Avenue; is that right?
A. Correct.
Q. And how is it that you recall that?
A. Well, I bought all of them there.
Q. You bought all of them at the Greenville store?
A. Yeah, it's real close to my office and it's just convenient. I had used Sears years before that, but they're so dadgum slow putting a battery in that I went to Firestone one year in the late '80s, you know, '87, '86, somewhere in there, and I bought a battery for a Cutlas, and Firestone got it in and got it out, and I like that. So I went back to the office, and when I needed one for the truck or any other vehicle that I had I went there.

Q. Okay.
A. They just gave me good service.
Q. And do you only go to the one on Greenville Avenue?
A. No, I've gone to the one on -- I think I took the battery, because I was out there, and I went to the Firestone for the replacement, on Northwest Highway, approximately Abrams.
Q. At the time you engaged in the replacement transactions, did you make any complaints with respect to the battery itself?
A. Oh, I just told them I thought it was kind of a bad battery to go bad that fast. It was a six -- if my memory is correct, it was a six-year battery, two years, two and a half years is kind of ridiculous.
Q. And what about, did you make any complaints in connection with the warranty transaction itself?
A. No.
Q. And did you have any complaints at the time with respect to the warranty transaction --
A. I just took their word -- I'm sorry to interrupt you again, but no, I just took their word. I'm sorry. They come out and they say here's what you've got and here's what we're going to give you for the rest of the battery's life and here's the purchase

price of a new one and here's what you owe us, and I'd just pay it.
Q. Looking at Document Request No. 3, did you conduct the search for request No. 3?
A. Well, that goes back to that's the battery that was replaced and went in the truck and the truck was sold and the documents went with it.
Q. All right. And how about No. 4?
A. Any complaints, I didn't have any complaints.
Q. All right. And No. 5?
A. You have to refer to Tom on that. I don't -- Tom and I've been in business for a long time, and he is a great attorney, my estimation, and I just do what he says, so I mean, I don't ask him for a log. He tells me if I owe him money and I give it to him, so anything there would be -- you would either already have it or he has it. I don't have it.
Q. What is it that you're trying to accomplish in connection with your objection in this case?
A. Well, if there's a class action lawsuit against Interstate, they must have done something wrong. I did business with them, so that's what I'm accomplishing.
Q. Okay. How about No. 6?
A. I'd refer to Tom on that one too.
Q. How about No. 7?

A. Any documents would be in the possession of Tom.
MR. COX: I think you've already got them.
Q. Do you use e-mail?
A. Sure.
Q. Do you communicate with Tom by e-mail ever?
A. Sometimes. But not on this.
Q. Okay. And No. 8?
A. That would have to be refer to my counsel again.
Q. Have you received any compensation in connection with your role as an objector in class action cases?
A. Once.
Q. When was that?
A. That was the propane tank deal.
Q. And what did you do to be paid in that case?
A. Filed an objection, and Tom handled the case for me and they paid the class action judgment, whatever that was, and I can't remember what it was.
Q. Do you know how much money it was?
A. Wasn't much. Wasn't much. It wasn't enough to pay me for coming to a deposition.
Q. Yeah. Was it more than $5,000?
A. Oh, no.

Q. Was it a thousand dollars?
A. No.
Q. It was less than that?
A. Oh, yeah, substantially.
Q. 500?
A. Less than that.
Q. And was it your goal in that case to receive financial compensation by objecting?
A. I'm just a firm believer that people that do business should do business correctly and if they don't, they should be punished, and I don't actively go out and try to solicit and find those people, but if they're out there and I happen to be involved in it, then I participate.
Q. And are you speaking of the defendants who are being sued in class action cases?
A. Yeah.
Q. Okay.
A. I'm not saying that every lawsuit means that they're guilty of it. I'm just saying that they're accused of being.
Q. Understood.
(Exhibit Number 3 marked.)
Q. All right. We marked the long form class notice as Exhibit 3. Go ahead and take a gander at


Page 22

that, if you could.
A. (Witness complies.) Okay.
Q. Have you seen this document before?
A. No.
Q. Do you know how your -- is the person in the bar that told you about this case, is that a friend of yours?
A. No.
Q. Do you know how he found out about the lawsuit?
A. No.
Q. Did you ask him?
A. No.
Q. Did you ask him any questions about the case?
A. No.
Q. Was there a settlement at that time, do you know?
A. No, he just mentioned that if you have an Interstate battery, you need to start doing some checking because there's problems with them or -- and something like that.
Q. Okay.
A. It was very off the cuff, and we also were drinking.
Q. Got it. I understand that.
(Exhibit Number 4 marked.)

Page 23

Q. I've marked as Exhibit 4 the Amended Class Action Settlement Agreement. Have you had a chance to take a look at that?
A. Yeah.
Q. Have you seen that before?
A. No.
Q. Okay.
(Exhibit Number 5 marked.)
Q. I've marked as Exhibit 5 the Objection to Proposed Settlement, Objection to Attorneys' Fees Request, Notice of Intention to Appear, and Request to Speak at the Hearing in the case captioned In re: Pre-filled Propane Tank Marketing & Sales Practice Litigation.
Same question, have you seen this before?
A. No.
Q. All right.
(Exhibit Number 6 marked.)
Q. I've marked as Exhibit 6, from the same Pre-filled Propane Tank case, a document captioned Notice of Appeal to the US Court of Appeals for the Eighth Circuit.
Same question, have you seen this document before?
A. No.

Page 24

Q. Do you know that you appealed a district court's final approval order in connection with the Pre-filled Propane Tank Marketing & Sales Litigation case?
A. I remember Tom talking about something like that, but --
Q. Filing an appeal?
A. So I would say he told me, but I haven't -- I didn't see any documents, and he knows I don't want documents, so.
Q. And do you know why you filed an appeal?
A. No.
Q. Do you know that the district court approved the settlement as fair, reasonable and adequate?
A. That's a legal question, whether it's fair, legal and adequate. You'd to ask my attorney, and if he filed an appeal, I think he's saying that it wasn't.
Q. Okay.
A. I'm not trying to be smart. That's my only answer I can give you.
Q. Okay. That's fine.
(Exhibit Number 7 marked.)
Q. I've marked as Exhibit 7 from the same propane tank case a document entitled -- it's a judgment dismissing the appeal. Have you seen this before?

Page 25

A. No.
Q. And do you know that the appeal that you filed was dismissed?
A. No.
Q. Okay.
A. So you must have been correct.
Q. What do you mean by that?
A. You must have been right.
Q. Who?
A. You won, I guess.
Q. I'm not sure what you mean.
A. Well, if the appeal was set aside, then you must have one.
Q. Oh, I see. Do you know that your lawyer voluntarily dismissed that appeal?
A. No.
Q. All right. Next document.
(Exhibit Number 8 marked.)
Q. We've marked as Exhibit 8 an Objection to Proposed Settlement in a case Kardonik, K-A-R-D-O-N-I-K, V. JPMorgan Chase & Co. The document refers to someone named Cindy Barginear?
A. That's my wife.
Q. Okay. And do you know a Daniel Sibley?
A. Yes, I know Daniel Sibley.

Page 26

Q. How do you know him?
A. He's the son of Gary Sibley.
Q. And is Gary Sibley Tom's law partner?
A. I don't know if it's partner or not, but they practice in the same office complex.
Q. Okay. And do you know Katie Sibley?
A. No.
Q. Do you know of her?
A. No.
Q. Okay. Do you have any understanding of why your wife filed an objection to this settlement?
A. I think it had to do with a mortgage. I could remember one but I couldn't remember why, and I pay all the bills, but her name was on the property, so she was the mortgage holder, if I'm correct.
Q. I see.
A. And again, I don't know. I just told her, Go to Tom and do what he says.
Q. Did you-all receive a notice of class action in the mail or something in that case?
A. I can't remember.
Q. How about in the propane case, how did you learn about that case?
A. I don't remember that one either. I was talk -- this was kind of weird, but I was buying a propane

Page 27

tank at Albertsons and there was a guy out there saying, Don't buy that. Natural question is "why?"
Q. Just some random guy?
A. Yeah, standing out there trying to create problems, I guess, for Albertsons. They ran him off. They called the cops on him, ran him off, because he's out there telling everybody, Don't buy a tank. And I bought tanks continuously from there and other places but -- because I have need of them, so. We have those heaters that you have in the backyard on the patio and we also have cookers and stuff so I'm always buying propane.
Q. Do you save your receipts from those purchases?
A. No.
Q. Was it a person who was warding people off -- warding them off on anything other than the propane tanks?
A. No.
Q. Just the propane tanks?
A. Yeah.
Q. Had you seen him before?
A. No.
Q. Have you seen him since?
A. No. Nicely dressed man in a suit.
Q. And did he explain there was a class action?

Page 28

A. He said that there was a lawsuit. He didn't say class action. He just said there was a lawsuit and you need to be careful. Pretty much it.
Q. Did he say anything else?
A. Not really. I mean, they had people out there standing and watching him trying to keep him from bugging customers. You know, the propane tank, I don't think, was as big a concern to the store as it was that the customers were being interfered with.
Q. Did you ask him any questions?
A. Didn't have a chance.
Q. Did you -- did you buy the propane tank?
A. I asked the store if -- were they blowing up or something, and they said no, so I bought the tank.
Q. Was there a tag or a sign or anything on the tank referring to a class action case?
A. No, not to my knowledge.
Q. Let's take five minutes.
(Brief recess.)
Q. We're back on the record. Do you have an attorney representation agreement with Mr. Cox in connection with this case?
A. If we do, it's a real old one. No, with this case, I don't think so.
Q. And again, what is it that you hope to

Page 29

accomplish with your objection?
A. Well, if -- in my business, if I do something wrong to a group of people and let's say five, four of them find out about it and get compensation from me, the fifth person ought to get it too, and so I'm in that thought process.
Q. And is it your contention that the compensation that's being made available in this case is inadequate?
A. Oh, sure, I don't think you can pay me enough for my deposition time this morning.
Q. And beyond that?
A. Beyond that, I don't know. I haven't seen anything.
Q. Okay. Do you know what a class representative is?
A. No.
Q. A class representative is the person who initiates the class action lawsuit against the alleged wrongdoer.
A. Okay.
Q. Have you ever initiated any class action lawsuits?
A. No.
Q. If the settlement in this case is set aside because of your objection, are you prepared to step in

and represent the class in this case?
A. I'd have to think that over.
Q. Have you had that discussion with your lawyer?
A. No.
Q. What would influence your willingness to step in as a class representative?
A. What Tom tells me.
Q. Would you be prepared to spend your own money in connection with acting as a class representative?
A. Depends on the final result.
Q. What do you mean by that?
A. Well, you don't throw money a hole with no hope of recovery. If I'm throwing money down a black hole and I put 50,000 in and the best I could hope to get back is 20, then no, I'm not going to do that.
Q. What if the best you could get back is $10?
A. I wouldn't put any money in. I wouldn't take a deposition.
Q. Would you take any financial risk in connection with a case like that?
A. No.
Q. In connection with your objection here, are you intending to represent the interest of other people?
A. I would think as a class everyone in the class represents the others in the class, so probably, yeah.

Q. Okay. And do you understand that there are legal obligations that come into play when you're representing the interest of others in connection with a lawsuit?
A. I could see that probably happening, but no, I've never discussed that with Tom.
Q. You have no understanding of what those legal obligations are?
A. Not really. Not being a lawyer, I'd have to say no.
Q. Okay. If you could change the terms of the settlement in this case, what would you do?
A. I don't know what the terms of the settlement are so I can't answer that.
Q. Okay. All right. Quick break. I'm probably done.
(Brief recess.)
MR. GIBBS: That's all I have.
MR. COX: We need our stipulations or agreements. Just by the Rules?
MR. GIBBS: Yeah, the Rules are fine.
MS. DURFEE: Laura Jane Durfee for Interstate Battery, no questions at this time.
(End of Proceedings.)

CHANGES AND SIGNATURE

WAYNE BARGINEAR - 6.25.12

PAGE LINE CHANGE REASON

I, WAYNE BARGINEAR, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

WAYNE BARGINEAR

THE STATE OF TEXAS )
COUNTY OF )

Before me, , on this day personally appeared WAYNE BARGINEAR, known to me (or proved to me on the oath of or through (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

(Seal) Given under my hand and seal of office this day of , 2012.

Notary Public in and for the State of Texas

STATE OF TEXAS )

This is to certify that I, Susan M. Foreman, Certified Shorthand Reporter in and for the State of Texas, reported in shorthand the statement given at the time and place set forth in the caption hereof, and that the above and foregoing pages contain a full, true, and correct transcript of said statement.

Dated: 6/25/2012

______________________________

Susan M. Foreman, CSR No. 5240
Expiration Date: 12.31.13
TSG Reporting, Inc.
747 Third Avenue
New York, New York 10017
Phone: 877.702.9580
Fax: 212.207.3311